1

2

3

4

5

6

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MODESTO IRRIGATION DISTRICT, et al.,<br><br>        Plaintiffs,<br><br>              v.<br><br>CARLOS M. GUTIERREZ, et al.,<br><br>        Defendants,<br><br>              and<br><br>NORTHERN CALIFORNIA COUNCIL OF FEDERATION OF FLY FISHERS, et al.,<br><br>        Intervenor-Defendants. | **1:06-cv-00453 OWW DLB**<br><br>**MEMORANDUM OPINION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION TO AUGMENT THE ADMINISTRATIVE RECORD (DOC. 51)** |

## I.   INTRODUCTION

A coalition of irrigation and water districts ("Plaintiffs") bring this challenge to the listing of the California Central Valley Steelhead (*O. mykiss*) under the Endangered Species Act ("ESA").  Pursuant to the scheduling order in this case, Defendant, the National Marine Fisheries Service ("NMFS"), produced the Administrative Record ("AR") on December 1, 2006. NMFS removed or redacted in part certain documents from the AR, asserting the deliberative process privilege and/or the attorney-client privilege.  Plaintiffs now move for an order requiring

**1**

1  NMFS to produce 22 documents withheld under the deliberative

2  process privilege and four documents withheld under the attorney-

3  client privilege.  (Doc. 51, filed Jan. 8, 2007.)  In addition,

4  Plaintiffs request that the AR be supplemented with one

5  additional document.[1]  (*Id*.)

6

7                          **II.   <u>BACKGROUND</u>**

8       The district court is familiar with the history of the

9  challenged listing, as cross motions for summary judgment were

10 recently heard in a related matter, *California State Grange v.*

11 *National Marine Fisheries Service*, 1:06-CV-0308 OWW DLB.[2]  The

12 complaint in the instant case alleges ten separate bases for

13 invalidating the listing.  (*See* Doc. 1, filed Apr. 14, 2006.)  Of

14 particular relevance to the pending motion is the Fourth Claim

15 for Relief, which challenges NMFS's decision to abandon its past

16 practice of applying its Evolutionarily Significant Unit Policy

17 ("ESU Policy") to *O. mykiss*, in favor of applying a different

18 policy, the Distinct Population Segment Policy ("DPS Policy"),

19 jointly formulated by NMFS and the United States Fish and

20 Wildlife Service ("FWS").  Plaintiffs maintain that NMFS did not

21

22       [1]  Plaintiffs' opening brief requested the production of
additional documents, but, through continued discussions, the

23 parties have narrowed the dispute to these 26 redacted or
partially redacted documents and the single extra-record

24 document.

25       [2] *Grange* challenges the same listing decision on overlapping

26 grounds, but the *Grange* case encompasses five separate
populations of *O. mykiss* in California, of which the California

27 Central Valley population is one.  The instant case, by contrast,
challenges only the listing of the California Central Valley *O.*

28 *mykiss* population.

                                **2**

1   sufficiently justify this policy shift.

2          **A.    The ESU Policy**.

3          In 1991, NMFS promulgated its "Policy on Applying the

4   Definition of Species Under the Endangered Species Act to Pacific

5   Salmon" (the ESU Policy).  56 Fed. Reg. 58,612 (Nov. 20, 1991).

6   The ESU Policy provides that a population of a Pacific salmonid

7   is considered an ESU, and therefore may be considered for listing

8   under the ESA, if it meets the following two criteria:

9          (1)   It must be substantially reproductively isolated from
                 other nonspecific population units; and
10
           (2)   it must represent an important component in the
11               evolutionary legacy of the species.

12  *Id.*  The ESU Policy is an interpretation by NMFS of what

13  constitutes a "distinct population segment" as that term is used

14  in the ESA's definition of "species."[3]  Until recently, NMFS

15  applied this policy to all salmonid species on the west coast of

16  the United States, including *O. mykiss*.

17         **B.    The DPS Policy**.

18         Together, NMFS and FWS developed a joint policy to "clarify

19  their interpretation of the phrase 'distinct population segment

20  of any species of vertebrate fish or wildlife' for the purpose of

21  listing, delisting, and reclassifying species under the [ESA]..."

22  ("Joint DPS Policy").  61 Fed. Reg. 4,722 (Feb. 7, 1996).

23  Pursuant to the Joint DPS Policy, three factors must be

24  considered when determining whether a population may be

25  considered a DPS:

26

27         [3]    The ESA defines "species" to include "any subspecies of
28  fish or wildlife or plants, and any distinct population segment
    of any species of vertebrate fish or wildlife which interbreeds
    when mature."  16 U.S.C. § 1532(16).

                                 **3**

1
2

    1.    <u>Discreteness</u> of the population segment in relation to the remainder of the species to which it belongs;

3
4

    2.    The <u>significance</u> of the population segment to the species to which it belongs; and

5
6

    3.    The population segment's <u>conservation status</u> in relation to the Act's standards for listing (i.e., is the population segment, when treated as if it were a species, endangered or threatened?).

7 *Id.* at 4,725 (emphasis added).

8     A population segment of a species may be considered

9 "discrete" if it satisfies <u>either</u> one of the following

10 conditions:

11
12
13
14

    1.    It is <u>markedly separated</u> from other populations of the same taxon as a consequence of physical, physiological, ecological, or behavioral factors. Quantitative measures of genetic or morphological discontinuity may provide evidence of this separation.

15
16
17

    2.    It is delimited by international governmental boundaries within which differences in control of exploitation, management of habitat, conservation status, or regulatory mechanisms exist that are significant in light of section 4(a)(1)(D) of the Act.

18 *Id.* (emphasis added).

19     Prior to the listing challenged in this case, the DPS Policy

20 had never before been applied to a west coast salmonid

21 population.  It had, however, been applied the Gulf of Maine

22 Atlantic salmon.  (*See* 1994 Memorandum of Understanding, attached

23 as Ex. L to the Declaration of William C. Paris III, Doc. 52.)

24     **C.**    **The *Alsea* Decision**.

25     On August 10, 1998, NMFS issued a final rule listing the

26 Oregon Coast coho ESU as threatened.  *See Alsea Valley Alliance*

27 *v. Evans*, 161 F. Supp. 2d 1154, 1159 (D. Or. 2001).  However,

28 despite the fact that the ESU included nine hatchery populations,

"NMFS only <u>listed</u> all 'naturally spawned' coho...." *Id.*  The

**4**

1  plaintiffs in *Alsea* sued to invalidate the coho listing, arguing

2  that the distinction NMFS drew "between hatchery spawned and

3  naturally spawned coho is untenable under the ESA because the ESA

4  does not allow the Secretary to make listing distinctions below

5  that of species, subspecies or a distinct population segment of a

6  species." *Id*. at 1161.  The district court agreed, finding the

7  listing to be "arbitrary and capricious and therefore invalid

8  because it relied on factors upon which Congress did not intend

9  the NMFS to rely." *Id*.

>           The central problem with the NMFS listing decision...
>           is that it makes improper distinctions, below that of a
>           DPS, by excluding hatchery coho populations from
>           listing protection even though they are determined to
>           be part of the same DPS as natural coho populations
>
>                               * * *
>
>           Once NMFS determined that hatchery spawned coho and
>           naturally spawned coho were part of the same DPS/ESU,
>           the listing decision should have been made without
>           further distinctions between members of the same
>           DPS/ESU.

*Id*. at 1162.

   **D.  The Initial Listing of *O. Mykiss* and *Modesto Irrigation District* v. Evans**.

   On March 19, 1998, applying the ESU Policy, NMFS listed the

California Central Valley ESU of *O. mykiss* as threatened.  63

Fed. Reg. 13,347.  Like in *Alsea*, NMFS's final rule pertaining to

the listing of the California Central Valley *O. mykiss* included

hatchery populations as part of the ESU, but listed as endangered

only naturally-spawning steelhead.  Plaintiffs filed suit to have

the listing declared invalid, alleging that NMFS violated the ESA

and the APA by: (1) listing naturally-spawning, but not hatchery,

populations of *O. mykiss*; and, (2) listing anadromous, but not

**5**

resident, members of *O. mykiss*, in certain rivers within the Central Valley of California.  (*See Modesto Irrigation District v. Evans*, 1:02-cv-06553 OWW DLB("*MID I*"), Doc. 79 at 3.)  The government conceded the first claim, acknowledging that the listing was invalid under *Alsea*.  (*Id.* at 28.)

With respect to the second claim, Plaintiffs maintained that the resident fish had been made part of the ESU and therefore, under *Alsea*, the listing of only anadromous fish was unlawful. After reviewing the relevant evidence, the district court concluded that NFMS indicated that "resident *O. mykiss* should be included in the listed steelhead ESU 'in certain cases,' such as '(1) where resident *O. mykiss* have the opportunity to interbreed with anadromous fish below manmade barriers or (2) where resident fish of native lineage once had the ability to interbreed with anadromous fish but no longer do so because they are currently above human-made barriers and are considered essential for recovery of the ESU.'"  (*Id.* at 43.)  Plaintiffs did not allege that this two-part test was insufficient or that NMFS failed to apply it properly.  Therefore, the district court concluded;

> Given that [federal defendants] did not classify resident steelhead as part of the DPS, [federal defendants] did not err in the same way as they did in failing to account for hatchery-bred populations in the listing decisions.  Whether [federal defendants] erred in failing to classify resident *O. mykiss* as part of the DPS is a separate question, and Plaintiffs do not provide enough evidence from the AR or otherwise to support a finding that the agency's ruling here was unlawful.  The issue remains "unclear."  Plaintiffs motion for summary judgment that NMFS's failure to lis resident populations under the ESA [is] impermissible is **DENIED.**

*(Id.* at 43-44.)

The district court declined to vacate the listing, and set June 11, 2005 as the deadline for promulgating a revised listing. (*Id.* at 63.)  That deadline was extended two times, with a final deadline of December 14, 2005.  (*MID I*, Docs. 85 & 100.) Although NMFS issued a listing shortly thereafter, the original rule was vacated.  (*MID I*, Doc. 112.)

**E.    The Challenged Listing.**

On June 14, 2004, applying its ESU Policy, NMFS again proposed listing the California Central Valley *O. mykiss* ESU as threatened.  69 Fed. Reg. 33,102.  Initially, the ESU was proposed to <u>include</u> resident rainbow trout below impassable barriers that co-occur with anadromous populations.  69 Fed. Reg. at 33,118.

Following an initial public comment period of 90 days, NMFS extended the public comment period two times.  69 Fed. Reg. 53,031 (Aug. 31, 2004); 69 Fed. Reg. 61,348 (Oct. 18, 2004). NMFS received comments disagreeing with the proposal to include rainbow trout in the ESUs and criticism on how it considered resident rainbow trout in evaluating the risk to the continued existence of the entire ESU.  70 Fed. Reg. 37,219, 37,220 (June 28, 2005); 71 Fed. Reg. 834, 836-7 (Jan. 5, 2006).

On June 7 2005, FWS wrote to NMFS, raising concerns about "the factual and legal bases for the proposed *O. mykiss* listings," indicating that there was substantial disagreement regarding the relationship between resident rainbow trout and steelhead populations and the best way to assess extinction risk to populations containing both resident and anadromous fish.  70

**7**

Fed. Reg. at 37,220.

On June 28, 2005, in light of FWS's concerns and those of other commentators, and to provide NMFS additional time to assimilate the new scientific information, NMFS announced that it was invoking the six month statutory extension of the deadline for a final determination on the ten proposed listings, pursuant to 16 U.S.C. § 1533(b)(6)(B)(I). 70 Fed. Reg. at 37,219. NMFS again solicited public comment on the issues relating to the scientific disagreement and uncertainty surrounding the relationship between resident and steelhead populations. *Id.*

Subsequently, on November 4, 2005, NMFS issued a federal register notice seeking public comment on whether it should depart from its past practice of applying the ESU policy to *O. mykiss* and instead apply the DPS policy. 70 Fed. Reg 67,130 (Nov. 4, 2005). NMFS noted that applying the DPS policy would be consistent with the past application, by both agencies, in defining DPSs of Atlantic Salmon, another species over which the two agencies share jurisdiction. *Id.*

On January 5, 2006, NMFS published a final rule regarding the proposed listing. 71 Fed. Reg. 834. In applying the Joint DPS Policy, all resident *O. mykiss* were excluded. As part of its justification for the listing, NMFS provided the following explanation:

> Given our shared jurisdiction [with FWS] over O. mykiss, and consistent with our approach for Atlantic salmon, we believe application of the joint DPS policy here is logical, reasonable and appropriate for identifying DPS of O. mykiss. Moreover, use of the ESU policy – originally intended for Pacific salmon – should not continue to be extended to O. mykiss, a type of salmonid with characteristics not typically exhibited by Pacific salmon.

*Id.*

**8**

### III.   DISCUSSION

**A.   Deliberative Process Privilege.**

   **1.   Legal Framework**

Judicial review of a listing decision made under the ESA is governed by the Administrative Procedure Act ("APA"), pursuant to which a court must "review the whole record or those parts of it cited by a party."  5 U.S.C. § 706(2)(A).  The APA's "whole record" requirement is nevertheless subject to claims of privilege.  *Ariz. Rehab. Hosp. v. Shalala*, 185 F.R.D. 263, 267 (D. Ariz. 1998); *see also Izaak Walton Leaque v. Marsh*, 655 F.2d 346, 370 (D.C. Cir. 1981)(finding it to be "well established" that "an agency may claim a privilege with respect to documents that may have influenced a particular decision").

The deliberative process privilege permits a party to withhold all or part of a document that is both "predecisional" and "deliberative."  *Nat'l Wildlife Fed'n v. United States Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir. 1988)(applying the deliberative process privilege in a Freedom of Information Act "FOIA" case).

> A "<u>predecisional</u>" document is one prepared in order to assist an agency decisionmaker in arriving at his decision, and may include recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency. A predecisional document is a part of the <u>deliberative process</u>, if the disclosure of the materials would expose an agency's decisionmaking process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.

*Assembly of Cal. v. United States Dept. of Commerce*, 968 F.2d

**9**

916, 920 (9th Cir. 1992) (internal citations and quotations omitted)(emphasis added); *see also Carter v. United States Dept. of Comm.*, 307 F.3d 1084, 1088-89 (9th Cir. 2002).  In other words, to qualify for the privilege, a document must be both "predecisional," in that it is "one prepared in order to assist an agency decisionmaker in arriving at his decision," *Assembly*, 968 F.2d at 920, and "deliberative," in that "it must actually be related to the process by which policies are formulated," *Greenpeace v. NMFS*, 198 F.R.D. 540, 543 (W.D. Wash. 2000)(citing *Nat'l Wildlife Fed'n,* 861 F.2d at 1117).

The purpose of the privilege is to allow agencies "freely to explore possibilities, engage in internal debates, or play devil's advocate without fear of public scrutiny." *Maricopa Audubon Soc. v. United States Forest Serv.*, 108 F.3d 1089, 1092 (9th Cir. 1997).  In addition, the privilege prevents "injury to the quality of agency decisions by ensuring that the frank discussion of legal or policy matters in writing within the agency is not inhibited by public disclosure." *Id*.

The government bears the burden of establishing that the information is exempt from disclosure.  *Id*.  To meet this burden, the government must offer "oral testimony or affidavits that are detailed enough for the district court to make a de novo assessment of the government's claim of exemption." *Id*. (internal quotations omitted).  In camera review is only appropriate if "affidavits and oral testimony cannot provide a sufficient basis for a decision" *Id*.  If the government relies on affidavits to meet its burden, they must contain "reasonably detailed descriptions of the documents and allege facts

**10**

1   sufficient to establish an exemption." *Id.*  A reviewing court

2   must "apply that burden with an awareness that the plaintiff, who

3   does not have access to the withheld materials, is at a distinct

4   disadvantage in attempting to controvert the agency's claims."

5   *Id.* (internal quotations omitted).

6       Critically, the deliberative process privilege is a

7   qualified privilege.  If a litigant can establish "his or her

8   need for the materials and the need for accurate fact-finding

9   override the government's interest in non-disclosure" the

10  privilege may be lifted.  *FTC v. Warner Communications*, 742 F.2d

11  1156, 1161 (9th Cir. 1984).  A court should consider four factors

12  when engaging in this balancing exercise: "1) the relevance of

13  the evidence; 2) the availability of other evidence; 3) the

14  government's role in the litigation; and 4) the extent to which

15  disclosure would hinder frank and independent discussion

16  regarding contemplated policies and decisions."  *Id.*

17      Accordingly, a court must "engage in a two-step process when

18  evaluating an assertion of privilege based on deliberative

19  process. First, the court must verify that the privilege applies,

20  i.e., that the agency communications being withheld are in fact

21  predecisional and deliberative in nature. Once the court has

22  satisfied itself that the assertion of privilege is proper it

23  must [then] make a determination that the agencys interest in

24  withholding the documents outweighs the moving party's interest

25  in securing them." *United States v. W.R. Grace*, 455 F. Supp. 2d

26  1140, 1144 (D. Mont. 2006).

27

28

**2.  NMFS's Submissions In Support of Its Assertion of the Deliberative Process Privilege.**

NMFS submitted the declaration of Samuel D. Rauch III, NMFS's Deputy Assistant Administrator for Regulatory Programs. (Doc. 60.)  His declaration explains the nature of all of the documents in dispute, and provides the agency's rationale for withholding those documents or partial documents.  In sum, each redacted document (or portion thereof) expresses recommendations or opinions on a policy issue among various officials at NMFS, NOAA, the Department of Commerce, FWS, the Department of the Interior, the Council on Environmental Quality ("CEQ"), and the Office of Management and Budget ("OMB").[4]

The following is a list, based on information contained in the Rauch Declaration, of the twenty two documents over which there is still a deliberative process privilege dispute:

PD #2233R:     An email chain from Donna Darm (Assistant Regional Administrator, Protected Resources, Northwest Region, NMFS) to Marta Nammack (National ESA Listing Coordinator, NMFS).  This document concerns the jurisdictional split over O. mykiss between NMFS and FWS.  The redactions provide opinions on different options.

PD #2235R:     An email chain from Marta Nammack to Donna Darm. This document is a continuation of Priv. Doc. No. 2233R, which concerns the jurisdictional split over O. mykiss between NMFS and FWS.  The redactions provide opinions on different options.

PD #2236R:     An email chain from Donna Darm to Marta Nammack. This document is a continuation of Priv. Doc. Nos. 2235R and 2233R, which concerns the jurisdictional split over O. mykiss between NMFS and FWS.

----

[4]     "CEQ and OMB are both components of the Executive Office of the President with coordination functions.  CEQ is responsible for coordinating environmental policy throughout federal agencies and programs.  OMB is responsible for coordinating regulatory programs throughout the federal government."  (Rauch Decl. at ¶10.)

PD #2240R:     An email chain from Donna Darm to Scott Rumsey
               (Marine Biologist, NMFS) and Michael Bancroft
               (NOAA Attorney), with cc's to Jim Lecky (Director
               of Protected Resources, NMFS) and Bob Lohn
               (Northwest Regional Administrator, NMFS).  This
               document is a discussion of issues regarding the
               jurisdiction of NMFS and FWS.  The redacted
               portions contain Donna Darm's opinion on the
               different strategies.

PD #2241R      An email from Scott Rumsey to Donna Darm.  This
               document is a discussion on the scientific
               literature on co-occurring rainbow trout and
               steelhead prepared for Bob Lohn.  The first
               redaction will be released to the plaintiffs, as
               it was inadvertently withheld.  The remaining
               redaction expresses an opinion on the weight of
               the scientific information provided.

PD #2242R      An email chain from Scott Rumsey to Donna Darm,
               which is a continuation of Priv. Doc. No. 2241R.
               This document is a discussion on the scientific
               literature on co-occurring rainbow trout and
               steelhead prepared for Bob Lohn and Bob's response
               to a discussion held.  The fourth redaction on the
               document (the first in the email from Scott Rumsey
               to Donna Darm) will be released to the plaintiffs,
               as it was inadvertently withheld (as it was in
               2241R).  The remaining redactions express opinions
               on the weight of the scientific information
               provided.

PD # 2243R:    An email chain from Scott Rumsey to Donna Darm,
               with a cc to Jim Lecky.  This document discusses
               the different possible approaches for handling
               co-occurring rainbow trout and steelhead in the
               Final Listing Rule.  The redactions express
               opinions on the different approaches.

PD #2244R:     An email chain from Donna Darm to Scott Rumsey.
               This document is a continuation of Priv. Doc. No.
               2243R, and discusses the different possible
               approaches for handling co-occurring rainbow trout
               and steelhead in the Final Listing Rule.  The
               redactions express opinions on the different
               approaches.

PD #2245R:     An email from Donna Darm to Jim Lecky, Bob Lohn,
               Samuel Rauch (Deputy Assistant Administrator for
               Regulatory Programs, NMFS), Michael Bancroft and
               Mary Beth Ward (Deputy General Counsel, NOAA).
               This document concerns an attached document that
               provides an approach for handling co-occurring
               rainbow trout and steelhead in the Final Listing
               Rule.  The redaction expresses an opinion on the
               approach.

1

2      PD #2249-01R:   A draft letter from FWS, being forwarded by Jim
                       Lecky to Edward Boling (Deputy General Counsel,
3                      Counsel on Environmental Quality (CEQ)) through AR
                       Doc. No. 2249.  The draft letter was never sent by
                       FWS.  It raises issues with NMFS' listing proposal
4                      that were later withdrawn.

5      PD #2250R:      An email from Marta Nammack to Angela Somma
                       (Chief, Endangered Species Division, Office of
6                      Protected Resources, NMFS).  This document
                       discusses the outcome of a meeting at CEQ, in
7                      which they agreed to using the DPS Policy for the
                       Final Listing Rule.  The redacted portion
8                      expresses Ms. Somma's opinion on her review of the
                       draft Final Listing Rule.

9      PD #2252R:      An email chain from Marta Nammack to Angela Somma,
                       Michael Bancroft, Mary Beth Ward, Samuel Rauch,
10                     Deanna Harwood (NOAA Attorney), Jim Lecky, Bob
                       Lohn and Dan Cohen (Chief Counsel for Regulation,
11                     Dept. of Commerce).  This document is a discussion
                       of comments made on the draft Final Listing Rule.
12                     The redactions express opinions on the draft Rule.

13     PD #2252-01R:   The attachment to PD #2252R.  This document is a
                       draft of the Final Listing Rule, with comments
14                     included by NMFS and Department of Commerce
                       personnel.  The redactions include opinions on
15                     legal or policy matters.

16     PD #2262R:      An email chain from Donna Darm to Kevin Allexon
                       (NOAA Senior Policy Advisor), with cc's to Mary
17                     Beth Ward, Michael Bancroft, Samuel Rauch, Dan
                       Cohen, Deanna Harwood, Jim Lecky, Scott Rumsey,
18                     Bob Lohn, Betsy Packard (an attorney for NOAA),
                       Karl Gleaves (Deputy General Counsel for
19                     Fisheries, NOAA), Craig Wingert (Southwest Region,
                       Long Beach Office Area Supervisor, NMFS), Lisa
20                     Manning (NMFS), Scott Rayder (NOAA Chief of Staff)
                       and Chris Scheve (NOAA Policy Advisor to the
21                     Secretary).  This document discusses the
                       possibility of defining the DPS as one unit.  The
22                     redacted portions provide Donna Darm and Scott
                       Rumsey's opinions on defining a DPS.
23

24     PD #2270R:      An email from Don Campton (FWS Senior Scientist)
                       to Scott Rumsey, with cc's to Vicki Finn (FWS) and
25                     Robin Waples (NMFS Scientist).  This document
                       concerns the use of the discreteness criterion of
26                     the DPS Policy in the Final Listing Rule, and the
                       redacted portion provides an opinion on the
27                     significance criterion.

28

PD #2271R:      An email chain from Marta Nammack to Donna Darm,
                with cc's to Michael Bancroft, Deanna Harwood,
                Scott Rumsey, and Craig Wingert.  This document
                discusses comments and suggestions made on the
                draft Final Listing Rule.  The redacted portion
                expresses an opinion on citing to the 1974 MOU
                (see paragraph 63 below) in the Rule.

PD #2272R:      An email chain from Jim Myers (NMFS Research
                Fishery Biologist) to Scott Rumsey.  This document
                is transmitting comments made by Jim Myers on the
                draft Final Listing Rule.  The redacted portion
                expresses an opinion on the content of the draft
                Rule.

PD #2272-01R:   Comments on the draft Final Listing Rule by Jim
                Myers.  The redactions include his opinions on the
                content of the draft Rule

PD #2287R:      An email from Bryan Hannegan (Chief of Staff, CEQ)
                to Scott Rayder, Kevin Allexon, Chris Scheve,
                Craig Manson, Julie MacDonald (Deputy Assistant
                Secretary for Fish and Wildlife and Parks,
                Department of the Interior), Dale Hall (Director,
                FWS), Jean Williams (Chief, Wildlife and Marine
                Resources Section, Department of Justice), with
                cc's to Paul Noe (OMB), Ruth Solomon (Policy
                Analyst, OMB), Edward Boling, James Connaughton
                (Chairman of CEQ).  This document concerns CEQ's
                review of the different positions of FWS and NMFS
                concerning the use of the DPS Policy for the Final
                Listing Rule.  The redacted portion provides an
                opinion on these issues.

PD #2289R:      An email from Ruth Solomon to Julie Mac Donald,
                Bryan Hannegan, Kevin Allexon, Chris Sheve, Dale
                Hall, Jean Williams, with cc's to Paul Noe (OMB),
                Gregory Schildwachter (CEQ), and Edward Boling.
                This document concerns an edit to the Final
                Listing Rule.  The first redaction will be
                released, as it was inadvertently withheld.  The
                second redaction is a policy-oriented
                recommendation.

PD #2290R:      An email chain from Julie MacDonald to Bryan
                Hannegan (Chief of Staff, CEQ), Scott Rayder,
                Kevin Allexon, Chris Scheve, Craig Manson, Dale
                Hall, Jean Williams, with cc's to Paul Noe, Ruth
                Solomon, Gregory Schildwachter, Edward Boling and
                James Connaughton.  This document includes PD
                #2287R, also concerning the different positions of
                FWS and NMFS on the use of the DPS Policy for the
                Final Listing Rule.  The redacted portions provide
                Julie MacDonald's opinion on these issues.

PD #2293R:      An email chain from Ruth Solomon to Julie
                MacDonald, Bryan Hannegan, Kevin Allexon, Chris
                Scheve, Dale Hall, Jean Williams, with cc's to
                Paul Noe, Gregory Schildwachter, and Edward
                Boling.  The first redaction will be released (as
                it was in 2289R), as it was inadvertently
                withheld.  The remainder of this document makes
                recommendations or expresses opinions on
                application of the DPS Policy to the Final Listing
                Rule.

Each of these documents appears to be both "predecisional,"
in that they are "draft documents, proposals, suggestions, and
other subjective documents which reflect the personal opinions of
the writer rather than the policy of the agency," and
"deliberative," in that they are "actually [] related to the
process by which policies are formulated."  Plaintiffs do not
seriously suggest otherwise.

In their opening brief, Plaintiffs confusingly argue that
the deliberative process privilege should not be applied to any
of these documents, which are all dated after June 28, 2005,
because documents created after that date cannot be considered
"predecisional."  (Doc. 51 at 13.)  Plaintiffs do not clearly
explain the significance of the June 28, 2005 date, apart from
noting that this was the date on which NMFS announced that it
would be exercising the statutory six-month extension to "resolve
the substantial disagreement regarding the sufficiency or
accuracy of the available data relevant to its determinations
vis-a-vis the ESUs proposed listing."  70 Fed. Reg. 37,219.  Why
this date should serve to cut off all later-dated predecisional
documents from coverage under the deliberative process privilege
is not clear.  It is undisputed that the key policy decision
challenged in this case was made on or about January 5, 2006,

when the final listing of the California Central Valley steelhead-only DPS issued.  Hence, anything that predates the January 5, 2006 final listing decision is "predecisional" for purposes of this lawsuit.

Plaintiffs reply brief still references the June 28, 2005 date, but appears to have abandoned the previous argument that all documents generated thereafter are automatically precluded from coverage because they cannot be "predecisional."  Rather, in reply, Plaintiffs argue: (1) that the AR does not reflect the official rationales provided by NMFS's for switching policies; and (2) that Plaintiffs' need to discover the "real" reasons behind the policy shift is sufficient to overcome the deliberative process privilege.  (Doc. 61.)  This two-step argument is not a direct challenge to whether any of the twenty two documents satisfies the initial requirements of the deliberative process privilege.  Rather, Plaintiffs invoke the balancing test set forth in *Warner*, suggesting that their need for the documents overcomes the qualified deliberative process privilege.  This issue is discussed below.

> **3.    Plaintiffs' Argument That Their Need to Discover the "Real" Reasons Behind NMFS's Decision to Switch Policies is Sufficient to Overcome the Deliberative Process Privilege.**

At the heart of Plaintiffs' request for disclosure is their assertion that NMFS is trying to cover up the "real" reasons underlying its shift from the ESU Policy to the joint DPS policy, a shift which resulted in the listing of only the anadromous (steelhead) life form of *O. mykiss*.  Plaintiffs maintain that the stated reasons for the policy shift are not supported by the AR.

**17**

Plaintiffs suggest that some alternative reason was the driving force behind the shift, and that any mention of this alternative reason has been excised from the final documents included in the AR.  Plaintiffs request access to the withheld documents so that they may probe NMFS's decisionmaking process to discover the "real" reasons behind NMFSs decisions.

The deliberative process privilege is a qualified privilege; it can be overcome if Plaintiffs can establish that their "need for the materials and the need for accurate fact-finding override the government's interest in non-disclosure."  *Warner Communications*, 742 F.2d at 1161.  A court should consider four factors when engaging in this balancing exercise: "1) the relevance of the evidence; 2) the availability of other evidence; 3) the government's role in the litigation; and 4) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions."  *Id*.

> ### a.   *Relevance of the Evidence Sought*.

Plaintiffs suggest that the redacted documents are relevant because they will reveal the "real" reasons behind NMFSs policy shift.  In support of this argument, Plaintiffs cite a number of cases which apply the deliberative process privilege in the context of the Freedom of Information Act ("FOIA").  Plaintiffs argue that the deliberative process privilege "springs" from FOIA itself, and, therefore, that the "strong policy...that the public is entitled to know what its government is doing and why...," which underlies FOIA, should be equally applicable in this case,

brought under the ESA.  (*See* Doc. 51 at 12-23; Doc. 61 at 3.)[5]

Plaintiffs overstate the link between FOIA and the deliberative process privilege and mistakenly assume that controlling weight should be given to the <u>FOIA's legislative goals</u>.[6]  Although the deliberative process privilege is one of the express statutory exemptions from document disclosure under FOIA, the privilege has common law origins.  *See United States v. Real Property Known and Numbered as 2847 Chartiers Ave.*, 142 F.R.D. 431, 434 (W.D. Pa. 1992) (noting that FOIA contains an expression of Congressional intent to codify components of the common law doctrine of executive privilege, but acknowledging that FOIA cases were relevant outside the context of FOIA because there are "no functional differences" in the way the privilege should be applied).

Regardless of the origins of the deliberative process

---

[5]   The language cited by Plaintiffs comes from *Maricopa,* 108 F.3d at 1092, which applied the deliberative process privilege narrowly in a FOIA case, in light of the "the strong policy of the FOIA that the public is entitled to know what its government is doing and why."  Plaintiffs also cite *In re Sealed Case*, 121 F.3d 729, 737 (D.C. Cir. 1997), another FOIA case, which held that the deliberative process privilege is routinely denied to insure "the public's interest in honest, effective government."

[6]   The deliberative process privilege does apply outside the context of FOIA, including to APA cases.  *See e.g. Ariz. Rehabilitation Hosp., Inc. v. Shalala,* 185 F.R.D. 263, 267-68 (9th Cir. 1998).  Moreover, it is appropriate to reference the numerous FOIA cases which have interpreted the privilege.  *Greenpeace v. NMFS*, 198 F.R.D. 540, 543 (W.D. Wash. 2000)(applying deliberative process privilege in ESA case and relying upon FOIA cases to aid interpretation of the privilege).  However, the relevance of the FOIA cases in applying deliberative process privilege does not automatically require the application of FOIA's <u>goals and purposes</u> to an ESA case.

privilege, Plaintiffs have pointed to no authority supporting the proposition that the <u>policies underlying FOIA itself</u> should control here.  Rather, because this case is brought under the APA, the policies underlying the APA should govern.  As a general rule, when a party challenges an agency action under the APA as arbitrary and capricious, "the reasonableness of the agency's action is judged in accordance with its <u>stated</u> reasons."  *In Re Subpoena Duces Tecum Served on Office of Comptroller of the Currency*, 156 F.3d 1279, 1279-80 (D.C. Cir. 1998)(citing *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402 (1971)).

> Agency deliberations not part of the record are deemed immaterial. *See Camp v. Pitts*, 411 U.S. 138(1973); *United States v. Morgan*, 313 U.S. 409 (1941). <u>That is because the actual subjective motivation of agency decisionmakers is immaterial as a matter of law-unless there is a showing of bad faith or improper behavior</u>. *See Saratoga Dev. Corp. v. United States*, 21 F.3d 445, 457-58 (D.C. Cir. 1994); *Overton Park*, 401 U.S. at 420 (Where there is no administrative record to review, the party challenging the agency action may inquire into the decisionmaking process in order to create such a record, but it does not necessarily follow that the party can also probe subjective motivations.)

*In re Subpoena Duces Tecum*, 156 F.3d at 1279-1280 (emphasis added).  Similarly, the United States Supreme Court, in *Overton Park*, held that "there must be a strong showing of bad faith or improper behavior before a court will inquire into the mental processes of decisionmakers."  401 U.S. at 420; *cf. Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2004)(recognizing limited exception to the "whole record" rule which allows augmentation of the administrative record when a party makes a

showing of agency bad faith).[7]   The deliberative process

privilege may be overcome when improper behavior on the part of

the decisionmakers is an issue in the case.   For example, when a

complaint alleges that the real motive for a facially neutral

decision was intentional discrimination, the subjective intent of

the decisionmakers is relevant.   *North Pacifica LLC v. City of*

*Pacifica*, 274 F. Supp. 2d 1118, 1124 (N.D. Cal. 2003)(city

council's motive and intent "central to [plaintiff's] equal

protection claim, and at issue is alleged government

misconduct").   Here, the subjective motives and intent of NMFS

are not "central" to Plaintiffs case.[8]

---

[7]     Although both *Lands Council* and *Overton Park* concerned
efforts to augment the administrative record with extra-record
evidence, the reasoning seems equally applicable to documents an
agency redacts from the administrative record under the
deliberative process privilege.

[8]     Plaintiffs place great weight on *Portland Audubon
Society v. Endangered Species Committee*, 984 F.2d 1534, 1548 (9th
Cir. 1993), in which environmental groups sought discovery
regarding allegedly improper ex parte contacts between the White
House and individual members of the Endangered Species Committee.
The Ninth Circuit found that such contacts had taken place and
should have been part of the administrative record, noting that
"[a]n incomplete record must be viewed as a 'fictional account of
the actual decisionmaking process.'"   *Id*. at 1548.   The Ninth
Circuit further reasoned that "[i]f the record is not complete,
then the requirement that the agency decision be supported by
'the record' becomes almost meaningless."   *Id*.   Notably, the
*Portland Audubon* court distinguished a case cited by the
government, *San Luis Obispo Mothers for Peace v. United States
Nuclear Regulatory Commission*, 751 F.2d 1287 (D.C. Cir. 1984).

>       There, the petitioners moved to supplement the record
>       with predecisional transcripts and related documents
>       from a meeting of the Nuclear Regulatory Commission.
>       Unlike the documents requested in *Mothers for Peace*,
>       those sought here concern neither the internal
>       deliberative processes of the agency nor the mental

1   Although Plaintiffs' entire argument that the actual reasons
2   given by the agency are not borne out by the AR could be
3   interpreted as an attempt to make a showing of bad faith, they do
4   not cite any bad faith cases nor do they suggest that any
5   misconduct occurred here.  Plaintiffs have read the AR, concluded
6   that it does not support the rationales given by the agency, and
7   now assert that some kind of "cover-up" took place without
8   providing any evidence of misconduct or bad faith.  A strong
9   showing of bad faith is required.  Plaintiffs' argument that
10  there are other "real" reasons behind the decision does not
11  satisfy this standard.

12              **b.   *Availability of Other Evidence*.**

13       The second *Warner* factor is the availability of other
14  evidence.  The briefs submitted by the parties regarding this
15  motion to augment already reflect the breadth and extent of the
16  existing AR and the evidence it contains.  The key merits issue
17  is whether the existing AR supports NMFS's stated bases for
18  setting aside its prior practice of applying the ESU policy in
19  favor of applying the joint DPS policy.  Plaintiffs can
20  adequately frame their arguments based on the existing AR.

21

22

23 ─────────────────────
                   processes of individual agency members. Rather, the
24                 discovery requested here involves allegedly improper ex
                   parte contacts between decisionmakers and outside
25                 parties.

26  *Portland Audubon*, 984 F.2d at 1549.  Therefore, according to the
27  Ninth Circuit's own reasoning, *Portland Audubon* is inapplicable
    to disputes over the assertion of the deliberative process
28  privilege.

**22**

### c. *The Government's Role in the Litigation*.

The third *Warner* factor is the government's role in the litigation. There are no cases that have discussed this factor in any depth. For example. in *Arizona Rehabilitation Hospital, Inc. v. Shalala*, 185 F.R.D. 263, 271 (D. Ariz. 1998), the government's role was considered "primary" where the lawsuit challenged the agency's actions under the APA. Without further discussion of that factor, the district court found that the plaintiffs had not shown that their need overrode the government's interest in the privilege. *Id.* The only real guidance as to the application of this factor comes from the *Warner* case itself. In its discussion of the government's role, the Ninth Circuit appeared to be looking for evidence of bad faith:

> Although the [Commission's] memoranda take positions which conflict with the Commission's litigation position, <u>the defendants have presented no evidence of bad faith or misconduct on the part of the Commission</u>. The fact that the Commission has in the past disclosed reports supporting its litigation position does not show bad faith in this case, nor does the fact that, prior to its decision to sue, the Commission disclosed the conclusions reached in one of the memoranda. Only the conclusions were disclosed; the analysis was kept secret

742 F.2d at 1162. Here, to the extent that this factor requires a court to look for evidence of bad faith, none has been shown.

### d. *The Extent to Which Disclosure Would Hinder Frank and Independent Discussion Regarding Contemplated Policies and Decisions*.

There is no doubt that the forced disclosure of draft documents and internal deliberations among high-level policymakers within the NMFS and related agencies would stifle frank and independent discussions regarding policy matters. This

1 is exactly the type of impact the deliberative process privilege
2 is designed to avoid.

### 4. Plaintiffs' Argument that the Deliberative Process Privilege Should Not Apply to Certain Documents Shared Between Agencies.

Plaintiffs argued in their opening brief that the deliberative process privilege should not apply to certain documents from outside agencies. (*See* Doc. 51 at 21.)  This dispute appears to have either been abandoned or resolved, as the argument has not been renewed.

In sum, NMFS has established that the deliberative process privilege is properly asserted for all twenty two disputed documents.  Plaintiffs have not established that their need for those documents, purportedly to discover the "real" motive behind the relevant policy decisions, overcomes the Government's interest in the privilege.  The "real" motive behind NMFS's decisions is not relevant in this APA case, beyond what the AR demonstrates, absent a showing of bad faith, which has not been made.

### B. Attorney-Client Privilege

### 1. Legal Framework.

As with the deliberative process privilege, the attorney-client privilege is applicable in administrative record cases. The attorney-client privilege exists to promote "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Upjohn Co. v. United States*, 449 U.S. 383, 389 (1981).  It applies to attorney-client relationships within the government, where the agency is client and a government attorney is counsel. *See Ariz. Rehab.*, 185

**24**

F.R.D. at 269.

The Ninth Circuit applies the privilege:

(1) where legal advice of any kind is sought,

(2) from a professional legal adviser in his capacity as such,

(3) [to] the communications relating to that purpose,

(4) made in confidence

(5) by the client,

(6) [which] are at the client's instance permanently protected

(7) from disclosure by himself or by legal adviser

(8) unless the protection is waived.

*Matter of Fischel*, 557 F.2d 209, 211 (9th Cir. 1977).

The privilege protects "confidential disclosures made by a client to an attorney in order to obtain legal advice,...as well as an attorney's advice in response to such disclosures." *United States v. Bauer*, 132 F.3d 504, 507 (9th Cir. 1997).

The Government cites a recent Second Circuit case, which notes that non-disclosure hampers the ideal of an open and accessible government, but recognizes that the public interest is served by allowing public officials access to candid legal advice. *In re County of Erie*, 473 F.3d 413 (2d Cir. 2007).

> We believe that, if anything, the traditional rationale for the [attorney-client] privilege applies with special force in the government context. It is crucial that government officials, who are expected to uphold and execute the law and who may face criminal prosecution for failing to do so, be encouraged to seek out and receive fully informed legal advice. Upholding the privilege furthers a culture in which consultation with government lawyers is accepted as a normal, desirable, and even indispensable part of conducting public business. Abrogating the privilege undermines that culture and thereby impairs the public interest. Access to legal advice by officials responsible for

25

> formulating, implementing and monitoring governmental policy is fundamental to 'promot[ing] broader public interests in the observance of law and administration of justice.'

*Id.* at 419 (citations omitted).

However, "because the privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose." *Fisher v. United States*, 425 U.S. 391, 403, 96 S.Ct. 1569, 1577 (1976); *United States v. Gray*, 876 F.2d 1411, 1415 (9th Cir. 1989)(the privilege is "narrowly and strictly construed"). Nevertheless, the attorney client privilege, once properly asserted, is absolute. *See Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1429, (3d Cir. 1991). The privilege may be waived, however, by disclosure of privileged materials to third parties. *Id.* at 1424.

### 2.   Disputed Documents for Which the Attorney-Client Privilege Is Asserted.

The only documents which remain in dispute from this category are four communications between attorneys and personnel of the Commerce Department, including NOAA and NFMS, and personnel from other agencies within the Executive Branch, including the Department of the Interior ("Interior"), FWS, CEQ, OMB. The following is a list of the four disputed documents, generated from information contained in the Rauch Declaration:

**PD #2265:**    An email from Dan Cohen (Chief Counsel for Regulation, Dept. of Commerce) to Ruth Solomon, and Edward Boling (Deputy General Counsel, CEQ), with cc's to NOAA attorneys, Department of Commerce attorneys, NMFS staff, management and policy advisors. The first paragraph of this email will be released to plaintiffs, as it was already released in 2266R. The remainder of the email makes recommendations or expresses opinions on application of the DPS Policy to the Final Listing Rule.

**PD #2266R:**       An email chain from Edward Boling to Dan Cohen, responding to an email sent from Dan Cohen to Edward Boling and Ruth Solomon, including cc's of NOAA attorneys, Department of Commerce attorneys, NMFS staff, management and policy advisors.  The document makes recommendations or expresses opinions on application of the DPS Policy to the Final Listing Rule.

**PD #2291:**        An email chain from Jean Williams (Chief, Wildlife and Marine Resources Section, Department of Justice), to Julie MacDonald (Deputy Assistant Secretary for Fish and Wildlife and Parks, Department of the Interior), Scott Rayder (Chief of Staff, NOAA), Kevin Allexon (NOAA Senior Policy Advisor), Chris Scheve (NOAA Policy Advisor to the Secretary), Dale Hall (Director, FWS), Craig Manson (Assistant Secretary of the Department of the Interior for Fish, Wildlife, and Parks), Bryan Hannegan (Chief of Staff, CEQ), with cc's to other CEQ and OMB officials.  The document makes recommendations or expresses opinions on application of the DPS Policy to the Final Listing Rule.

**PD #2292R:**       An email chain from Edward Boling to Julie MacDonald, Jean Williams, Bryan Hannegan, Scott Rayder, Kevin Allexon, Chris Scheve, Craig Manson, and Dale Hall, with cc's to officials from CEQ and OMB.  The document makes recommendations or expresses opinions on application of the DPS Policy to the Final Listing Rule.

The Government admits that these communications were shared with individuals from the Executive Branch outside the Commerce Department.  Plaintiffs assert that this sharing constitutes a waiver of the attorney-client privilege.  The Government responds that either the "unitary executive" theory or the "common interest" extension of the attorney client privilege applies to shield these four documents from disclosure.

### a.   The Unitary Executive Theory.

Article II, § 1, of the United states Constitution provides that "[t]he executive Power shall be vested in a President of the United States of America."  Under the "unitary executive" theory

**27**

of government, "the President alone possesses all of the
executive power and [] he therefore can direct, control, and
supervise inferior officers or agencies," including those "who
seek to exercise discretionary executive power."  Steven G.
Calabresi & Kevin H. Rhodes, *The Structural Constitution: Unitary
Executive; Plural Judiciary*, 105 Harv. L. Rev. 1153, 1165-66
(1992).  The theory has been advanced in recent years to argue
that independent agencies and counsels that exercise
discretionary executive power are unconstitutional.  *Id.*; see
also *In re sealed Case*, 838 F.2d 476 (D.C. Cir. 1988)(discussing
the history of the unitary executive theory in the context of a
challenge to the authority of independent counsel appointed under
provisions of the Ethics in Government Act), reversed on other
grounds, *Morrison v. Olson*, 487 U.S. 654 (1988).

   The Government relies upon the theory here to argue that
multiple agencies can constitute a single client for the proposes
of the attorney-client privilege, but cites no authority applying
the doctrine in this manner.  If the Government is correct in its
assertion that the Unitary Executive theory constitutes an
additional exception to the waiver doctrine, then any
communication between attorneys at any agency would be shielded
from disclosure, regardless of whether the two agencies shared
any common legal interest.  In fact, there are circumstances in
which one agency might be adverse to another.  For example, the
Equal Employment Opportunity Commission frequently investigate
and prosecutes cases against other agencies for employment
discrimination.  The Government's theory, if taken to its logical
extreme, would protect communications between such adverse

**28**

agencies simply because they are both part of the Executive Branch.   There is no authority to support such an extension of the law.

### b.   The Common Interest Doctrine.

Alternatively, the Government asserts that "the sharing of attorney-client information does not waive the privilege because the entities shared (and continue to share) a common interest." (Doc. 60 at 20.)   This doctrine, otherwise known as the "joint defense privilege" or the "joint client doctrine," "overcome[s] what would otherwise have constituted a waiver of communication because a communication has been shared between two clients" with a common legal interest.   *Griffith v. Davis,* 161 F.R.D. 687, 693 (C.D. Cal. 1995).   The Government cites *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003) (citations omitted), which observed:

> The common interest privilege, frequently referred to as the joint defense privilege, applies where (1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived.   The privilege does not require a complete unity of interests among the participants, and it may apply where the parties' interests are adverse in substantial respects.

*See also United States v. Zolin*, 809 F.2d 1411, 1417 (9th Cir. 1987) (common interest rule "protects communications made when a nonparty sharing the client's interests is present at a confidential communication between attorney and client"), overruled on other grounds by *United States v. Jose*, 131 F.3d 1325 (9th Cir. 1997).

To qualify, the common interest between the parties must be like the interest shared by "allied lawyers and clients who are

working together in prosecuting or defending a lawsuit or in certain other legal transactions...." *Bergonzi*, 216 F.R.D. at 496.  Another district court reasoned that the "critical inquiry is whether a sufficient commonality of interests exists between the parties such that the privilege may be asserted." *In re Imperial Corp. of America*, 179 F.R.D. 286, 289 (S.D. Cal. 1998)(internal citation and quotation omitted). However, the application of the common interest does not require <u>complete</u> unity of interests. *Bergonzi*, 216 F.R.D. at 496.

The Government asserts that "NMFS/Department of Commerce and FWS/Department of Interior are part of a single, coordinated executive branch and have joint responsibility under ESA Section 4 to interpret and apply the statutory term 'distinct population segment,'" and "the communications among them furthered provision of legal services to each agency" in implementing this shared statutory goal.  (Doc. 60 at 21.)

Arguing that this "joint responsibility" under the ESA is insufficient, Plaintiffs point to a First Circuit case which declined to apply the doctrine to "abstract" common interests that were <u>unlike</u> the relationship between "allied lawyers and clients-who are working together in prosecuting or defending a lawsuit or in certain other legal transactions...." *United States v. Mass. Inst. of Tech.*, 129 F.3d 681, 686 (1st Cir. 1997)("*MIT*").  In *MIT*, the IRS sought to obtain certain billing statements from MIT.  MIT refused to produce the documents, citing the attorney-client privilege.  However, the IRS discovered that MIT had previously shared the billing statements with the Defense Contract Audit Agency, an arm of the Department

**30**

of Defense charged with auditing government contracts.  The IRS
alleged that such sharing waived the attorney-client privilege.
MIT argued that common interest doctrine should overcome the
waiver, because MIT and the Audit Agency shared a common interest
in the proper auditing and payment of MIT's bills.  The First
Circuit rejected MIT's argument, reasoning:

> In a rather abstract sense, MIT and the audit agency do
> have a "common interest" in the proper performance of
> MIT's defense contracts and the proper auditing and
> payment of MIT's bills. But this is not the kind of
> common interest to which the cases refer in recognizing
> that allied lawyers and clients-who are working
> together in prosecuting or defending a lawsuit or in
> certain other legal transactions-can exchange
> information among themselves without loss of the
> privilege. To extend the notion to MIT's relationship
> with the audit agency, which on another level is easily
> characterized as adversarial, would be to dissolve the
> boundary almost entirely.

*Id.*

    *MIT* is distinguishable.  In that case, the relationship
between MIT and the Audit Agency was arguably adversarial, the
only "common" interest between them being the "proper auditing
and payment of MIT's bills."  Here, although during the
deliberative process the various agencies may not have always
agreed on the policy outcome, the deliberations served the common
governmental purpose of resolving disagreements and formulating a
mutually agreeable policy to comply with the law.  The agencies
were engaged in a common effort and sought the advice of counsel
about fulfilling their statutory mission.  The participating
agencies who received the four disputed communications shared
interests analogous to the interests shared by "allied lawyers
and clients-who are working together in prosecuting or defending
a lawsuit or in certain other legal transactions."

**31**

Plaintiffs next cite *Bergonzi*, 216 F.R.D. 487, in which former executives of a company intentionally misstated the company's publicly reported financial results.  The company hired a law firm to investigate the matter and assist with the review. The company also entered into confidentiality agreements with the Securities and Exchange Commission ("SEC"), which stated that the company would provide the results of its review to the SEC. Pursuant to the confidentiality agreement, the law firm provided materials to the United States, which, in turn, produced some of those materials to the former executives in discovery.  The company sought to recover the materials produced to its former executives, arguing that it shared a common interest with the United States and that the materials were therefore subject to the common interest extension of the attorney-client privilege. Citing *MIT*, the district court found that the company and United States "did not have a true common goal," because the United States continued to reserve the right to prosecute the company in addition to its former executives.  *Id*. at 496.[9]

Plaintiffs argue that the consultations between the agencies in this case were "imbued with adversarial possibilities."  (Doc.

_____

[9]     Plaintiffs also cite an unpublished follow-up case, involving the same parties.  *Aronson v. McKesson HBOC, Inc.*, 2005 WL 934331, *7 (N.D. Cal. 2005).  In *Aronson*, the company again tried to assert that it had not waived the attorney work product privilege due to the existence of the common interest extension. Again, the district court refused to find the extension applied, stating the company's "interests in pinpointing the source of the alleged accounting misdeeds and those of the government were not sufficiently aligned to consider them non-adverse or to characterize their relationship as necessarily operating toward a common legal interest."

61 at 15.)   Specifically, Plaintiffs note that possibility of
shifting to the DPS policy was raised by the June 7, 2005 letter
sent by FWS to NMFS, which indicated that FWS did not agree that
any ESU that included resident rainbow trout warranted listing,
and warned that any unilateral effort to list such an ESU would
not be proper, as FWS had jurisdiction over the resident form.
(*Id.* citing AR 2218.)   Immediately after the June 7, 2005 FWS
letter, NMFS asked CEQ to "mediate" the disagreement between NMFS
and FWS on the proper policy to apply.   (*Id.* citing AR 2237.)
However, as noted above, although the agencies were not always in
agreement during the deliberative process, the deliberations
served the purpose of resolving those disagreements to present a
mutually agreeable policy decision that complied with the law to
achieve a shared statutory purpose.

     Plaintiffs further challenge the Government's assertion that
the "Executive Branch generally, and NMFS/Commerce and
FWS/Interior specifically, had a common interest in the
consistent application of the term 'distinct population
segment.'"   Plaintiffs first assert that this stated common
interest is insufficient, noting that the Government states in
its opposition brief that "the regulated public" holds the same
interest.   (Doc. 60, Opp., at 20.)   Thus, Plaintiffs argue,
"taking Defendants at their word, Plaintiffs and all other
members of the public should be entitled to the documents."   This
is sophistry.   The various agencies shared responsibility over
the policy and statutory issues to be decided and should be able
to communicate through government counsel as joint clients.

     Finally, Plaintiffs contend that the very idea that the

**33**

discussions by and between the Executive Branch agencies were
designed to insure the consistent interpretation of the term
distinct population segment is "not supported by the facts."
(Doc. 62 at 15.)   Plaintiffs argue:

> Under the ESU Policy, the O. mykiss "distinct
> population segment" is comprised of both anadromous and
> resident members; under the DPS Policy, there are two
> O. mykiss "distinct population segments," one comprised
> of the anadromous form and one comprised of the
> resident form. The discussion among the Executive
> Branch agencies was not about resolving this conundrum
> and insuring the consistent interpretation of the term
> "distinct population segment," but was rather about
> choosing the applicable policy to avoid jurisdictional
> problems. (AR 2246-01 [listing only anadromous form
> "resolves jurisdictional issues with Interior."]; see
> also AR 2252-01R ["The present scenario, however, in
> which we must make DPS determinations for O. mykiss
> while not having jurisdictional authority over all
> members of the biological species, requires [NMFS] to
> reconsider whether it is most appropriate to apply the
> ESU or DPS policy to the delineation of 'species.'"]).

(*Id.* at 15-16.)   Essentially, Plaintiffs maintain that because
the agencies labeled this a "jurisdictional" dispute, they could
not possibly be simultaneously seeking to ensure the uniform,
consistent interpretation of the "distinct population segment"
language.   This defies logic.   The two agencies were advocating
that different interpretations of the term "distinct population
segment" be applied to *O. mykiss*: NMFS initially advocated the
application of its own ESU policy; FWS insisted upon the
application of its DPS policy.   This is <u>both</u> a jurisdictional
dispute, insofar as the split was between two different agencies,
<u>and</u> an attempt to ensure the consistent application of the term
in the ESA evaluation.

Plaintiffs also emphasize that CEQ, which was asked to
mediate the jurisdictional dispute between NMFS and FWS, "urged

just two weeks before the final listing decision was published on January 5, 2006 that a 'policy process' between the agencies to insure the consistent interpretation of the term 'distinct population segment' take place as soon as possible after the listing was finalized in a 'non-species specific' environment. (AR 2287R)."  (Doc. 61 at 16.)  Plaintiffs argue:

> The fact that CEQ is requesting such a process two weeks before the final listing decision is published demonstrates that the Defendants' characterization of the discussions between the various Executive Branch agencies is incorrect.

(*Id.*)  This reads too much into the CEQ's request.  Having just worked to resolve the dispute/inconsistency in the context of the *O. mykiss* listing, the CEQ merely urged the agencies to take a global look at their interpretation of the language.

Here, although the documents for which the attorney-client privilege is asserted were shared between multiple agencies, those agencies shared the common goal of reaching a mutually acceptable policy decision that would withstand legal challenge. Accordingly, the common interest doctrine operates to protect these documents from disclosure.

Plaintiffs motion for an order requiring the disclosure of the four documents (2265, 2266R, 2291, and 2292R) claimed to be attorney-client privileged, is **DENIED**.

C.  **Plaintiff's Request to Augment the AR with a 1994 Memorandum of Understanding Between NMFS and FWS Regarding Atlantic Salmon**.

The general rule is that judicial review in an APA case should be of "the full administrative record that was before the [agency decisionmaker] at the time he made his decision." *Overton Park,* 401 U.S. at 420.  Post-decisional documents are not

**35**

ordinarily included in the administrative record. *See Rock Creek*
*Alliance v. United States Fish and Wildlife Serv.*, 390 F. Supp 2d
993, 998 (D. Mont. 2005) (refusing to consider post-decisional
information not available to the agency in that particular form
at the time of the decision).   However, the Ninth Circuit
recognizes several exceptions to this general rule, permitting
the administrative record to be augmented:

> (1) if admission is necessary to determine whether the
> agency has considered all relevant factors and has
> explained its decision,
>
> (2) if the agency has relied on documents not in the
> record,
>
> (3) when supplementing the record is necessary to
> explain technical terms or complex subject matter, or
>
> (4) when plaintiffs make a showing of agency bad faith.

*Lands Council,* 395 F.3d at 1030. "These limited exceptions
operated to identify and plug holes in the administrative
record...[and] are narrowly construed and applied."   *Id.*

> The scope of these exceptions permitted by our
> precedent is constrained, so that the exception does
> not undermine the general rule. Were the federal courts
> routinely or liberally to admit new evidence when
> reviewing agency decisions, it would be obvious that
> federal courts would be proceeding, in effect, de novo,
> rather than with the proper deference to agency
> process, expertise, and decision-making.

*Id.*

   Here, Plaintiffs seek augmentation of the AR with a single
document, a 1994 Memorandum of Understanding By and Between NMFS
and FWS ("1994 MOU"), which establishes how the two agencies will
work together to implement a related 1974 MOU regarding the
listing, management, and conservation of the the Gulf of Maine
Atlantic salmon.   Although Plaintiffs do not cite *Lands Council*
or any alternative authority for augmentation, it appears that

1   Plaintiffs seek augmentation under either the first (documents
2   necessary to determine whether the agency has considered all
3   relevant factors and has explained its decision) or second
4   (documents the agency has relied on but are not in the record)
5   *Lands Council* exceptions.

6       In support of adding the 1994 MOU, Plaintiffs place great
7   weight on the fact that, in the final listing decision at issue
8   in this case, NMFS noted that the shift to the DPS policy was
9   "consistent with [its] approach for Atlantic salmon":

10          In a previous instance of shared jurisdiction over a
            species (Atlantic salmon), we and FWS used the DPS
11          policy in our determination to list the Gulf of Maine
            DPS of Atlantic salmon as endangered…Given our shared
12          jurisdiction over O. mykiss, and consistent with our
            approach for Atlantic salmon, we believe application of
13          the joint DPS policy here is logical, reasonable, and
            appropriate for identifying DPSs of O. mykiss.

14  (71 Fed. Reg. at 837).

15      NMFS has already agreed to add the Federal Register notice
16  containing the final listing of the Gulf of Maine Atlantic salmon
17  (65 Fed. Reg. 69,459) to the AR.  (*See* AR 530).  NMFS has also
18  added the 1974 MOU, which describes the jurisdictional
19  responsibilities of both agencies, to the AR.  However, NMFS
20  refuses to add the 1994 MOU, asserting that NMFS did not consider
21  or rely upon it in the *O. mykiss* listing process.  Mr. Rauch
22  explained that the "arrangement of shared jurisdiction over the
23  Gulf of Maine DPS of Atlantic salmon was referenced in the Final
24  Listing Rule as an example of prior application of the DPS policy
25  to a species over which the agencies shared jurisdiction...."
26  (Rauch Decl. at ¶66.)

27
28

**37**

The split in jurisdiction between the Services, which was established in the ESA and clarified in the reorganization of the 1974 MOU, led NMFS to examine the Atlantic salmon listing decision as precedent for applying the DPS policy to salmonids.  Since the steelhead/rainbow trout populations we were considering fell partially within our jurisdiction and partially within FWS' jurisdiction, NMFS felt it was reasonable to take an approach on which the two Services had previously agreed.

(*Id.*)  However, with respect to specific documents regarding the Atlantic salmon listing, "unlike the 1974 MOU [which was referenced by NMFS in the O. mykiss listing], NMFS did not consider the 1994 MOU or its contents during the decision-making process."  (*Id.* (emphasis added).)

Plaintiffs assert that this statement "simply cannot be reconciled with the facts in the Administrative Record."  (Doc. 61 at 17.)  Specifically, Plaintiffs note that the ESU Policy was, on its face, designed only to apply to Pacific salmonids. Therefore, Plaintiffs argue, "there is nothing precedential about the fact that the Gulf of Maine Atlantic salmon DPS was determined using the DPS Policy."  (*Id.*)[10]  This may be an overly

---

[10]   Plaintiffs correctly note that this very discrepancy was highlighted by agency staff:

The Administrative Record reflects that in December 2005, as NMFS prepared its final listing decision and attempted to justify the switch from the ESU to DPS Policy, Mr. Michael Bancroft, an attorney with NOAA, apparently suggested that NMFS argue that the Gulf of Maine scenario was precedential. (AR 2278R) (Plaintiffs say "apparently" since Mr. Bancroft's entire e-mail is redacted, but portions of two responses are not and reveal his suggestion). In response, Marta Nammack of NOAA wrote "But one thing to note, we never intended to use the ESU policy for Atlantic salmon." (AR 2278R)(emphasis added). Deana Harwood, also of NOAA, also responded to Mr. Bancroft by stating "We chose to use the DPS policy for Atlantic salmon because FWS and NMFS developed the policy together for all other vertebrates except Pacific salmonids. The ESU policy was only meant for Pacific salmon." (AR 2278R).

(Doc. 61 at 18.)

narrow view of Mr. Rauch's use of the term "precedential."  As

noted above, Mr. Rauch declares that the Atlantic salmon listing

was an example of an approach "on which the two Services had

previously agreed."

> The split in jurisdiction between the Services, which
> was established in the ESA and clarified in the
> reorganization of the 1974 MOU, led NMFS to examine the
> Atlantic salmon listing decision as precedent for
> applying the DPS policy to salmonids.  Since the
> steelhead/rainbow trout populations we were considering
> fell partially within our jurisdiction and partially
> within FWS' jurisdiction, <u>NMFS felt it was reasonable
> to take an approach on which the two Services had
> previously agreed</u>.

(Rauch Decl. at ¶66.)  Plaintiffs have not established that Mr.

Rauch's statement regarding the alleged purpose of NMFS' citation

to and reliance on the Gulf of Maine Atlantic salmon listing is

incorrect.  Plaintiffs simply disagree with the agencies'

decision to follow the Atlantic salmon example and maintain that

the decision is not justified.

More persuasive is Plaintiffs' argument that the 1994 MOU

should be admitted because it establishes and describes the

<u>actions</u> that were taken by NMFS and FWS to coordinate the listing

of the Atlantic salmon, including:

> (1) that the listing will be made jointly, by both
> agencies, since under Section 3(a) of the 1974 MOU,
> neither FWS nor NMFS has clear jurisdiction over a
> species and a joint listing is therefore required, (2)
> providing that the two agencies will make a joint
> listing, will appoint a joint team to review all
> subsequent actions related to the Gulf of Maine
> Atlantic salmon, and (3) develop a joint strategy for
> rehabilitating the Gulf of Maine Atlantic salmon.

(Doc. 61 at 19 (citing the 1994 MOU, at 1-2, attached as Ex. L to

the Paris Declaration).)  Plaintiffs suggest that the explanation

given by NMFS is insufficient because, by omitting any discussion

of the <u>process</u> set forth in the 1994 MOU, NMFS failed to draw a

complete parallel between the *O. mykiss* listing and the Atlantic salmon listing. An administrative record may be augmented with extra-record evidence is "if admission is necessary to determine whether the agency has considered all relevant factors and has <u>explained</u> its decision..." *Lands Council,* 395 F.3d at 1030. Although it is not entirely clear at this stage of the case how the 1994 MOU will aid the court's analysis, the document appears to be relevant to the adequacy of NMFS's justification for the policy shift. Accordingly, Plaintiff's motion to augment with respect to the 1994 MOU is tentatively **GRANTED,** without prejudice to the filing of a motion to reconsider this ruling at a later stage of the case.

## IV.   CONCLUSION

For the reasons set forth above:

(1)   Plaintiffs' motion for an order requiring the disclosure of the twenty six disputed documents over which the deliberative process privilege and/or the attorney client privilege have been asserted is **DENIED;** and

(2)   Plaintiffs' motion to augment the Administrative Record with the 1994 MOU is **GRANTED,** without prejudice to the filing of a motion to reconsider this ruling at a later stage of the case.

IT IS SO ORDERED.

**Dated:   March 8, 2007**            /s/ Oliver W. Wanger
b2e55c                     UNITED STATES DISTRICT JUDGE

**40**